## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

**KIMBERLY RENAE ANDREWS,**

     **Plaintiff,**

**v.**                                                              **Case No.:** `7:18cv281`

**VIRGINIA POLYTECHNIC INSTITUTE
AND STATE UNIVERSITY |
COMMONWEALTH OF VIRGINIA,**

**SERVE:
Timothy D. Sands
Office of the President
Burruss Hall, Suite 210
800 Drillfield Drive
Blacksburg, VA  24061**

     **Defendant.**

### COMPLAINT

The above-named Plaintiff, Kimberly Renae Andrews ("Plaintiff" or "Dr. Andrews"), by counsel, states as her Complaint against Defendant Virginia Polytechnic Institute and State University | Commonwealth of Virginia ("Virginia Tech") the following:

### I.  JURISDICTION AND VENUE

1.  This Court has jurisdiction over this matter as it arises from the federal questions presented by Title VII of the Civil Rights Act of 1964, as codified under 42 U.S.C. §§ 2000e, *et seq.*, 42 U.S.C. § 2000e-5(f) ("Title VII").  *See generally* 28 U.S.C. §§ 1331, 1343(a)(4).

2.  The acts and/or omissions of Virginia Tech from which the following causes of action arise, occurred within Montgomery County, Virginia.

3.   Venue is proper in this Court, as the acts and/or omissions substantially occurred within the Court's geographic area. *See* 28 U.S.C. § 1391(b)(2).

4.   Venue is appropriate as the acts and/or omissions of Defendants from which these causes of action arise, occurred within the Western District of Virginia. *See* 28 U.S.C. § 1391(b)(2).

5.   Dr. Andrews timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in May of 2017.  Dr. Andrews received a Dismissal and Notice of Rights from the EEOC dated March 22, 2018, attached hereto as **EXHIBIT A**.  Dr. Andrews files suit within ninety (90) days of receipt of that Dismissal and Notice of Rights.

## II. THE PARTIES

6.   Dr. Andrews is a former resident of the Town of Christiansburg, Virginia, and was employed by Virginia Tech at all times relevant.  Dr. Andrews identifies her race as Black.

7.   Virginia Tech is a state university and, thus, a state agency, of the Commonwealth of Virginia. Virginia Tech's main campus, administration, Board of Visitors, officers, attorneys, and Director | President are all located in the Town of Blacksburg, Virginia.

## III.  FACTUAL ALLEGATIONS

8.   Dr. Andrews began her employment with Virginia Tech on or around June 1, 2012.

9.   Dr. Andrews served as the Director of TRiO Programs[1] from June of 2012 through June of 2017.

10. At all times relevant, Dr. Andrews' direct supervisor was Dr. Susan Short, Associate

---

[1] The TRiO Programs are intended to assist prospective first generation and low-income middle and high school students in South West Virginia to learn about college and potential careers.

Vice President of Outreach and Engagement, who, upon information and belief, identifies her race as Caucasian.

11. At all times relevant, Dr. Susan Short ("VP Short"), was responsible for the Outreach and Engagement Unit, a part of the Virginia Tech Division of Outreach and International Affairs.

**Discriminatory & Hostile Work Environment | Extreme Lack of Diversity**

12. From the very outset of Dr. Andrews' hire, she was not provided with the opportunities to thrive in her working environment.  Upon information and belief, this was solely due to her race, Black.

13. Considering the fact that the TRiO Program is intended to assist low-income and first generation potential higher education attendees, many of whom are minorities, Dr. Andrews was surprised to learn that her work environment lacked diversity in the extreme.

14. When Dr. Andrews interviewed for the Director of TRiO Programs position, there were two other individuals employed within the TRiO Program who, upon information and belief, identified their race as Black.  However, both of these individuals resigned shortly after Dr. Andrews' interview.  Accordingly, after 2012, diversity in Dr. Andrews' immediate work environment was lacking.

15. Dr. Andrews was vocal about her concern that the program employees were not reflective of the student population the program was intended to serve.

16. In addition, upon information and belief, Dr. Andrews was the only minority Director/Administrator within her "Unit" for the entirety of her employment. Dr.

Andrews recalls that she was the only Director/Administrator minority/person of color at any of the Outreach and Engagement Directors' meetings.

17. Indeed, Dr. Andrews' predecessor was a Caucasian male and, upon information and belief, the individual who was hired to replace Dr. Andrews is a Caucasian female.

18. Dr. Andrews was vocal about the lack of diversity at Virginia Tech and, upon information and belief, this valid observation made her a target at Virginia Tech.

### Discriminatory & Hostile Work Environment | Disparate Treatment Failure to Train, Constantly Undermined, No Grant Assistance, Exclusion from Unit Committees, Job Title/Pay Issue, Resource Refusal

19. Dr. Andrews was treated differently than similarly situated Caucasian co-workers.

20. VP Short failed to provide Dr. Andrews with any onboarding training subsequent to Dr. Andrews' hire.  This is in stark contrast to other, Caucasian employees who received substantial onboarding training.

21. Despite requests, Dr. Andrews was not provided with any training or direction in regards to hiring new employees, completing certain requisite contract and budgeting paperwork, the fact that one of her subordinate employees was on an unusual telework agreement, the fact that one subordinate employee was retiring, or even the existence and names of student employees under Dr. Andrews' purview.

22. Dr. Andrews consistently requested training and direction from her direct supervisor, VP Short, but was relegated to gleaning information on her own.

23. This lack of initial training significantly disadvantaged Dr. Andrews in that it made her transition to a new position very difficult, created unnecessary and repetitive work, and unfairly made Dr. Andrews' appear to be inept at her new position.

24. VP Short was also frequently dismissive of Dr. Andrews' ideas and comments, in stark contrast to the deference she gave to other, Caucasian employees.  As examples, Dr. Andrews suggested the creation of a formal "onboarding/training" committee due to the struggles she initially experienced, creative ideas for the inclusion of other Departments when giving tours or recruiting students the TRiO Program was intended to serve, and new technological initiatives.  Dr. Andrews was either scolded or ignored as a result of all of these suggestions.

25. VP Short also undermined Dr. Andrews as Dr. Andrews attempted to facilitate her normal job duties.  Indeed, during her tenure, Dr. Andrews chaired several job applicant committees within her Department and consistently received push back and difficulties in completing this basic task.  By contrast, when Dr. Andrews provided a Caucasian co-worker with an opportunity to chair a job application committee in 2016, Dr. Andrews observed this employee to receive certain necessary inter-departmental approval quickly and with none of the problems experienced by Dr. Andrews.  Upon information and belief, this was solely due to the fact that this employee was Caucasian and had nothing to do with her skills or approach.

26. As one discrete example, Dr. Andrews was required to complete numerous revisions and participate in numerous email chains and meetings regarding the drafting of a simple position description/job posting for a Counselor Position in the VT Upward Bound Program in 2016.  Dr. Andrews was even required to request (on multiple occasions over the course of several weeks) the removal of inaccurate and uncompliant Equal Employment and Affirmative Action language, all of which were required by the

grant providing funding for the position.  This language was added/removed by VP Short, Jane Swan, Director of Finance and HR Administration for Outreach and International Affairs, and Nancy Gruber, Director of Finance and Administration, without Dr. Andrews' knowledge or consent.  The position reported directly to Dr. Andrews so the revisions and meddling related to Dr. Andrews' draft position description/job posting was unnecessary and invasive.  In addition, Dr. Andrews was responsible for making certain that this position (and others) complied with certain federal grant requirements and the aforementioned revisions, made without Dr. Andrews' permission or even knowledge, were not in line with those requirements and could have resulted in loss of funding and even Dr. Andrews' disciplinary action.  Upon information and belief, this was in contrast to the deference to draft position descriptions/job postings that were created by Caucasian employees and that Dr. Andrews observed during her employment and, upon information and belief, that have been created since Dr. Andrews' separation from employment.

27. During her tenure, Dr. Andrews was responsible for setting up grants in coordination with the Virginia Tech Office of Sponsored Programs.  On several occasions, Dr. Andrews asked VP Short for assistance with these large projects but her requests were denied.  Upon information and belief, subsequent to Dr. Andrews' separation from employment, VP Short provided substantial additional assistance to the current Director in this regard, who is Caucasian.

28. During her tenure, Dr. Andrews requested to serve on various Unit Committees at Virginia Tech but was never provided with an opportunity to do so by her supervisor, VP

Short.   Upon information and belief, subsequent to Dr. Andrews' separation from employment, Caucasian employees have been invited to serve on these Unit Committees.

29. On multiple occasions, Dr. Andrews petitioned for a title change from "Director" to "Executive Director" and corresponding pay raise due to the extensive grant writing Dr. Andrews completed.   VP Short consistently denied those requests with no legitimate explanation.   Upon information and belief, subsequent to Dr. Andrews' separation from employment, VP Short has openly expressed her desire to create an "Executive Director" position whose main job duty would be to manage the many grants previously handled by Dr. Andrews.

30. Dr. Andrews, always the consummate professional, proposed working with a mediator in regards to her professional relationship with VP Short but VP Short declined.

31. Dr. Andrews also experienced difficulties when interacting with other internal Departments.  As one example, upon her arrival to Virginia Tech, Dr. Andrews discovered that the TRiO Program database was homemade by internal Information Technology staff and was extremely outdated.   Dr. Andrews requested the opportunity to purchase a replacement database called "Blumen." This reasonable request was denied by the Director of Outreach Information Services, a Caucasian.   Dr. Andrews was then required to purchase a secondary and second-rate database for her Program.   This entire process took close to two (2) years to complete, an inordinately long time for such a simple request.   Upon information and belief, Dr. Andrews' treatment by individuals in the Outreach Information Services was solely due to her race.   In contrast, upon information and belief, Dr. Andrews' sucessor requested that she be permitted to purchase the Blumen

database and her request was granted and the implementation process was started within a mere six (6) month time frame.

32. Despite Dr. Andrews' repeated requests, necessary repairs and renovations to the TRiO Office space were ignored for years by VP Short and the Virginia Tech Facilities Department.  As an example, when Dr. Andrews arrived at Virginia Tech in 2012, she was dismayed to learn that the TRiO Program offices experienced rodent and insect infestations, including flying reproductive ants flooding Dr. Andrews' office desk and window sill, leaks and cracks in the walls that resulted in water actually raining into Dr. Andrews' office when the weather was poor, and mold issues.  Dr. Andrews and her staff, consequently, experienced allergic reactions, bronchial issues, and migraine headaches. Dr. Andrews and her staff were forced to handle these issues on their own by purchasing home remedies such as mouse deterrents and insect spray.  Dr. Andrews specifically complained that this refusal on the part of Virginia Tech to address these concerning issues was racially motivated and she was vocal about her perception that the condition of the office space was a concerning representation of how Virginia Tech viewed and/or welcomed the minority population the TRiO Program served. Only after another Virginia Tech Administrator observed the dismal conditions first hand (wherein he remarked that his review of the TRiO Program office was one of the "darkest days" he ever experienced at Virginia Tech) were the conditions remedied.  In contrast, upon information and belief, certain structural issues such as cracks in the walls and ceilings have recently occurred in the TRiO Program offices and steps were immediately taken to work to remedy the situation at the request of Dr. Andrews' Caucasian sucessor.

**Discriminatory & Hostile Work Environment | Dr. Andrews Ostracized**

33. Dr. Andrews, in an attempt to cultivate a professional working relationship with VP Short, requested that VP Short join Dr. Andrews for lunch on a regular basis. VP Short inexplicably declined on every occasion. In contrast, Dr. Andrews frequently observed VP Short to join other, Caucasian co-workers for lunch. Dr. Andrews was not invited to these lunches.

34. Recognizing the importance of communicating with her supervisor and realizing that VP Short intended to exclude Dr. Andrews both socially and within the context of their working relationship, Dr. Andrews then approached VP Short and requested additional in-person meetings with VP Short. VP Short ignored Dr. Andrews' requests.

35. VP Short did provide a hollow offer for Dr. Andrews to set up appointments for "walking meetings" with VP Short. Dr. Andrews set up no less than nine (9) "walking meetings" with VP Short during her employment. All nine (9) were canceled by VP Short at or near the appointed time.

36. Even though Dr. Andrews repeatedly requested that VP Short participate in regular meetings with her in a myriad of ways, those requests were either ignored or denied. At best, VP Short ultimately deigned to a monthly meeting with Dr. Andrews, many of which were cut short due to VP Short's personal obligations such as veterinary appointments for her cat.

37. In stark contrast, upon information and belief, after Dr. Andrews' separation from employment, VP Short scheduled in-person, bi-weekly meetings with Caucasian employees, including Dr. Andrews' successor.

**Discriminatory & Hostile Work Environment | Hostile Subordinate**

38. Upon information and belief, one of Dr. Andrews' subordinate employees, Sarah Umbarger-Wells, who, upon information and belief, identifies her race as Caucasian, harbored a discriminatory animus against Dr. Andrews based solely upon Dr. Andrews' race.

39. Ms. Umbarger-Wells was consistently personally rude to Dr. Andrews.   In addition, Ms. Umbarger-Wells refused to complete assignments in the manner assigned by Dr. Andrews. For example, Ms. Umbarger-Wells scheduled meetings with other directors without informing or seeking permission from Dr. Andrews.  Ms. Umbarger-Wells refused to incorporate changes to office policies and procedures implemented by Dr. Andrews.  Ms. Umbarger-Wells also purposefully failed to complete assignments in a timely manner and purposefully sent out correspondence from the office without Dr. Andrews' necessary and prior review.

40. Ms. Umbarger-Wells remained recalcitrant, difficult, and generally unprofessional in her daily interactions with Dr. Andrews throughout the entirety of their working relationship.  Upon information and belief, Ms. Umbarger-Wells treated Dr. Andrews in this manner due to Dr. Andrews' race.

41. Despite Ms. Umbarger-Wells' treatment of Dr. Andrews, Dr. Andrews always treated Ms. Umbarger-Wells with respect and support.  As examples, Dr. Andrews: (1) co-wrote a grant with Ms. Umbarger-Wells shortly after Dr. Andrews became employed at Virginia Tech so as to provide Ms. Umbarger-Wells with grant-writing experience; (2) allowed Ms. Umbarger-Wells time to achieve and obtain a non-profit certificate after Ms.

Umbarger-Wells expressed interest; (3) after Ms. Umbarger-Wells expressed interest in a doctorate program, Dr. Andrews agreed to send Ms. Umbarger-Wells to a national conference that provided professional development within that field; and (4) upon discovery that Ms. Umbarger-Wells had never chaired a committee, Dr. Andrews invited Ms. Umbarger-Wells to chair an employee search committee.

42. Unfortunately, Dr. Andrews' overtures were not well received by Ms. Umbarger-Wells.  Ms. Umbarger-Wells was unappreciative of the opportunities presented by Dr. Andrews.

43. Similarly, after Dr. Andrews placed Ms. Umbarger-Wells as the chair of the employee search committee to gain experience, Ms. Umbarger-Wells once again failed to follow Dr. Andrews' direction regarding the process. During one round of interviews of the candidates, Ms. Umbarger-Wells prepared questions that would clearly favor a candidate known by some of the search committee members and Ms. Umbarger-Wells. Dr. Andrews required that those questions be stricken from the round of interviews. Ms. Umbarger-Wells refused to follow Dr. Andrews' direction and proclaimed the stricken questions in front of the candidate.

44. Dr. Andrews even went so far as to explore working with a mediator to repair the working relationship but was informed by the potential mediator that Ms. Umbarger-Wells ultimately refused to consider this option.

45. In contrast to Ms. Umbarger-Wells' recalcitrant approach to her interactions with Dr. Andrews, upon information and belief, Ms. Umbarger-Wells is friendly, helpful, and professional to Dr. Andrews' sucessor, a Caucasian.

**Discriminatory & Hostile Work Environment | Racial Comments**

46. During her employment, Dr. Andrews was frequently subjected to a hostile working environment filled with negativity, unprofessionalism, and racially tinged comments when supervisors and co-workers spoke to and interacted with Dr. Andrews.

47. During Dr. Andrews' first several months at Virginia Tech, Dr. Andrews noticed a pattern whereby VP Short would introduce Dr. Andrews to Virginia Tech employees/co-workers, all of whom appeared to identify their race as Black.

48. When Dr. Andrews inquired of VP Short why VP Short only introduced her to individuals who identified themselves as Black, VP Short advised Dr. Andrews that VP Short thought it would be beneficial for Dr. Andrews to meet "*people* who could be helpful" to her [Dr. Andrews]. Dr. Andrews replied that she was interested in meeting all employees and co-workers, not just minorities. However, VP Short simply ceased all introductions at that point. Notably, VP Short failed to introduce Dr. Andrews to any of the other Unit Directors and left Dr. Andrews to muddle through those new introductions on her own.

49. Multiple times throughout her employment, VP Short referred to Dr. Andrews as "girl," which is a well-known derogatory term associated with race.

50. Throughout the entirety of her employment, Dr. Andrews was subjected to negative comments in regards to her attire, despite the fact that her attire was always professional.

51. Dr. Karen Eley Sanders who, upon information and belief, identifies her race as Black, at that time was the Associate Vice President for Student Success, and who was

instrumental in hiring Dr. Andrews, relayed to Dr. Andrews that other Caucasian employees called Dr. Sanders to report that Dr. Andrews' attire to a Director's meeting in 2012 was "inappropriate."  At that particular meeting, Dr. Andrews was wearing casual clothing, including shorts, t-shirt, and tennis shoes, due to the fact that she was running a TRiO summer camp during that time period.  Upon information and belief, Dr. Andrews' Caucasian predecessor wore similar attire to Director's meetings frequently (even when he was not spearheading summer camps) but was never accused of wearing "inappropriate" attire.  Dr. Sanders suggested that Dr. Andrews use this as an opportunity to provide an example for her Unit about "Blacks" and that, if the other Directors were comfortable around Dr. Andrews, then that might open the door to other Blacks."

52. VP Short, Andrea Brunais, Director of Communication, and other co-workers regularly asked Dr. Andrews about her "ethnic" hair and "how" Dr. Andrews was able to style her hair in different ways and "what type of hair" her "braids" were, inferring that Dr. Andrews used artificial hair when wearing her hair in braids.

53. Ms. Brunais expressed her opinion that Dr. Andrews should wear her hair "naturally" and in a "fro." Ms. Brunais further requested to take a picture of Dr. Andrews' "unique look," on a day when Dr. Andrews wore an African print skirt and her hair was styled in an afro.

54. Upon information and belief, Ms. Umbarger-Wells and VP Short regularly made condescending comments about Historically Black Colleges or Universities ("HBCU"). Both individuals denigrated HBCU's and called them "dirty" and worried about the "safety" of TRiO students visiting those institutions.

55. Ms. Umbarger-Wells frequently commented that she would never recommend that a TRiO student visit or attend an HBCU because they are "not good schools." Ms. Umbarger-Wells also made disparaging remarks about the quality of education received at HBCU.

56. Upon information and belief, not only are these remarks suggestive of a general racial bias but they were directed as barbs at Dr. Andrews as both VP Short and Ms. Umbarger-Wells were well aware that Dr. Andrews is a graduate of a HBCU.

57. In a quarterly Outreach and International Affairs Division meeting in 2017, Dr. Andrews noted that, while the topic of race was frequently included as an agenda item, the topic was never fully covered due to time limitations and because the topic was often listed as the last agenda item.  Dr. Andrews shared her perception that this suggested that the topic was not of actual importance to the Division.   Accordingly, Dr. Andrews proposed that, in future meetings, the topic be moved up higher in the agenda.   Dr. Andrews' suggestion was completely ignored and she was subsequently subjected to the following inappropriate commentary during the remainder of the meeting:

    a. Caucasian male stated:  *I'm from Mississippi, and I married a girl from California. I didn't know it, but she told me she thought I was racist. It was just a way of life for me. She helped me see this, but I just didn't know.*

    b.  Caucasian female stated:  *Well where I'm from, I didn't grow up around Blacks. If a girl went off and got pregnant by a Black, we accepted the baby and tolerated it because it wasn't the baby's fault. But we just didn't associate with Blacks.*

    c.  Caucasian female stated: *I traveled to Africa for work and so I understand what it is like to be a minority because there were very few Whites there. I felt vulnerable and afraid.*

58. Dr. Andrews also experienced the concerning trend of individuals challenging her intelligence due to her race.  As one example, during a monthly Director meeting for Outreach and International Affairs, Dr. Andrews was called upon to share one word that described her Unit.  Dr. Andrews replied with the word: "Impactful."  The Director of the Office of Economic Development who, upon information and belief, identifies his race as Caucasian, stated in a disrespectful manner to the group, "Is that even a word?!"  Dr. Andrews replied that "impactful" was, indeed, a word and the Director challenged her again by stating, "How do YOU know?"  Other Caucasian attendees of the meeting shared their thoughts on a word that described the Unit during the meeting with no push back or aggressive commentary by the Director.  As usual, Dr. Andrews was the only minority in this meeting.  Dr. Andrews later complained about this incident as racially motivated to VP Short and requested an apology, but Dr. Andrews' complaints were ignored.

59. As another example, Dr. Andrews attended a Virginia Tech Board of Visitors meeting in 2014.  Upon learning that Dr. Andrews attended this meeting, VP Short inquired as to why Dr. Andrews attended and condescendingly inquired if Dr. Andrews "understood" everything that occurred at the meeting.  Dr. Andrews replied that she was competent to understand as the meeting was very basic and that she had a right to attend public forums if she so chose.

60. Upon information and belief, subsequent to Dr. Andrews' separation from

employment, a male who, upon information and belief, identifies his race as Black, was offered an Associate Director position in the TRiO program.  Upon information and belief, VP Short stated that she agreed to hire him because: "I like him.  He can be *handled*."

### Another Minority Employee in Unit Treated Disparately

61. As an example of the discriminatory animus rampant in Dr. Andrews work environment, Dr. Andrews suggested, after Ms. Umbarger-Wells did a poor job during two failed employee candidate searches in 2016, that employee Jason Puryear, a male of Latino descent, be permitted to take over the candidate searches.

62. While Mr. Puryear was more than capable, VP Short declined and directed Dr. Andrews to take over the searches herself (despite Dr. Andrews' large work load) or to let Ms. Umbarger-Wells continue despite Ms. Umbarger-Wells' poor work product and lack of experience in the area.  Upon information and belief, Mr. Puryear's race was the deciding factor in this situation.

63. Dr. Andrews also attempted to facilitate a pay increase for Mr. Puryear in or around January of 2016, that was commensurate with other Caucasian employees in the office. Dr. Andrews received significant push back in this regard and was unsuccessful at granting Mr. Puryear a commensurate pay increase.  Again, upon information and belief, Mr. Puryear's race was the deciding factor in this situation.

64. As support for this contention, shortly thereafter, Dr. Andrews hired a Caucasian female employee but was directed to pay her an amount that was more than Mr. Puryear received, even though this new employee had half as much experience as Mr. Puryear.

16

**Dr. Andrews Complains About Racism and Discrimination**

65. Dr. Andrews complained about Ms. Umbarger-Wells' unprofessionalism towards Dr. Andrews to VP Short on multiple occasions and expressed her concerns that Ms. Umbarger-Wells was racially biased against her (Dr. Andrews).  Dr. Andrews made multiple complaints in this regard to VP Short in 2015, 2016, and 2017.

66. Upon information and belief, Ms. Umbarger-Wells was never counseled or disciplined for her actions.

67. Upon information and belief, VP Short shared Dr. Andrews' complaints about Ms. Umbarger-Wells to Ms. Umbarger-Wells, which served only to deteriorate the working relationship further.

68. Dr. Andrews also complained to VP Short about racial discrimination in general at Virginia Tech and complained about her personal struggles against racial discrimination at Virginia Tech.

69. VP Short dismissed and ignored all of Dr. Andrews' complaints.

70. Dr. Andrews was also retaliated against for these complaints.

71. When VP Short refused to adequately investigate Dr. Andrews' complaints about these issues, Dr. Andrews complained directly to a representative from the Virginia Tech Office for Equity and Accessibility, Karissa Moore.  This complaint occurred in 2016 via telephone.  Ms. Moore asked Dr. Andrews if Dr. Andrews felt she was being discriminated against and/or harassed and Dr. Andrews replied in the affirmative.

72. Dr. Andrews also made multiple complaints about a racially hostile work environment and racial discrimination to Rodney Irvin, a representative from the Office

of Employee Relations and, on at least one occasion to Pam White, the Executive Director of Equity and Accessibility.  Dr. Andrews expressed her concerns about retaliation and, while Mr. Irvin was sympathetic to Dr. Andrews' situation, he warned her that retaliation would likely occur if Dr. Andrews filed any sort of written complaint in this regard.  Mr. Irvin suggested the process of mediation to Dr. Andrews—a suggestion which Dr. Andrews attempted twice, as previously noted.

73. Upon information and belief, no investigation was ever completed by Virgina Tech subsequent to Dr. Andrews' multiple verbal complaints.

### Retaliation | False Sex Harassment Complaint

74. However, upon information and belief, Dr. Andrews was targeted and retaliated against for making complaints about a racially discriminatory and hostile work environment.

75. This retaliation and Ms. Umbarger-Wells' discrimination and harassment of Dr. Andrews went to new levels in or around February of 2017 when Ms. Umbarger-Wells, through VP Short, submitted a false charge of female-on-female sexual harassment against Dr. Andrews through the Virginia Tech Office for Equity and Accessibility.  This time, the Office was quick to investigate.

76. The allegations contained in Ms. Umbarger-Wells' complaint were false and twisted a story Dr. Andrews relayed to Ms. Umbarger-Wells and other co-workers in regards to how Dr. Andrews had, unfortunately, experienced sexual harassment while she was in college.  This story was shared within the context of discussing Title IX training.

77. Upon information and belief, this false charge was submitted solely to discriminate

against and harass Dr. Andrews, to further contribute to the hostile working environment experienced by Dr. Andrews, and in an attempt to retaliate against Dr. Andrews and facilitate Dr. Andrews' discipline or termination from employment.

78. During the pendency of the investigation, Virginia Tech Office for Equity and Accessibility Investigator Nikeshia Arthur received multiple complaints about racial discrimination in general, and observations of racial discrimination directed against Dr. Andrews in particular, from several witnesses (including from co-workers Arlethea Scott, Jason Puryear, and Renee Akers). In addition, within the context of the investigation, Dr. Andrews herself complained that she was "treated differently because of her race." However, upon information and belief, these claims were never adequately investigated by Virginia Tech.

79. In addition, upon information and belief, Dr. Andrews detailed to Ms. Arthur that the complainant, Ms. Umbarger-Wells, had actually been the one who violated sexual harassment policies when she invited co-workers to "touch her breasts" after having a surgical procedure related to her breasts. Dr. Andrews provided the names of two witnesses, co-workers Jerald Neely and LaTanya Walker, who were physically present when Ms. Umbarger-Wells invited others to touch her breasts. Both individuals were available to speak with Investigator Arthur but neither witness was contacted during the pendency of the investigation.

80. Upon information and belief, Ms. Umbarger-Wells falsely advised Investigator Arthur on an almost daily basis that she [Ms. Umbarger-Wells] did not feel "safe" in the office with Dr. Andrews during the pendency of the investigation. Dr. Andrews took no

action to cause Ms. Umbarger-Wells to allege such a patent and further retaliatory falsehood.

81. The results of the investigation ultimately determined that there was no finding of any fault or of any deviation from workplace policy on the part of Dr. Andrews.

82. Upon information and belief, Ms. Umbarger-Wells was not counseled or disciplined for her inappropriate comments/actions in the work place nor for filing a clearly unsupported complaint against Dr. Andrews.

83. Concerningly, the multiple complaints of racial discrimination that came to light during the investigation were not further explored by Virginia Tech.

### Further Retaliation | Audit & Disciplinary Action

84. Upon information and belief, Dr. Andrews was further targeted and retaliated against for making complaints and/or raising concerns about her discriminatory and hostile treatment.

85. In or around February of 2017, Dr. Andrews was notified that her Unit was scheduled to undergo a financial audit.

86. Upon information and belief, Dr. Andrews was targeted and retaliated against in that she was deemed the scapegoat for any subpar audit results.

87. Dr. Andrews was directed to draft a Management Action Plan in response to the findings for the audit.  However, Dr. Andrews was provided with no meaningful assistance or direction in the creation of the Management Action Plan.  Rather, on or around March 21, 2017, VP Short forwarded Dr. Andrews a short, two-paragraph sample excerpt and reminded Dr. Andrews that Dr. Andrews was required to submit the draft Plan within the

next week.

88. In addition, upon information and belief, Ms. Swan and VP Short revised, without Dr. Andrews' knowledge, certain portions of the Management Action Plan, prior to submitting the Plan to the Auditor and the Virginia Tech Board of Visitors, ultimately resulting in Dr. Andrews being provided with a May 2, 2017 Counseling Memorandum threatening further disciplinary action.

89. During this time frame, VP Short also unfairly berated Dr. Andrews and stated that Dr. Andrews and "ruined" and "destroyed" relationships with Dr. Andrews' team and others at Virginia Tech.

**Dr. Andrews' Constructive Discharge | Additional Retaliation**

90. After suffering years of discrimination, culminating in a false sexual harassment complaint and a Unit audit and related undeserved disciplinary action, Dr. Andrews, understandably, could take no more.

91. Dr. Andrews was required to certify for and take Family and Medical Leave Act leave, beginning on or around June 5, 2017, related to a Major Depressive Episode related to multiple stressors, most of which were employment related.  Dr. Andrews also experienced High Blood Pressure, Hypertension, Insomnia, and Loss of Appetite, all of which required treatment by a health care provider, during this time period.

92. Accordingly, Dr. Andrews was unable to return to her toxic working environment and was ultimately constructively discharged on or around June 20, 2017.

93. Unfortunately, Dr. Andrews was subjected to additional retaliatory treatment even after her constructive discharge from employment.  As one example, upon information

21

and belief, Ms. Umbarger-Wells falsely stated to various individuals, including a candidate for employment, that Dr. Andrews engaged in unethical and deceptive behavior concerning financial resources during Dr. Andrews' employment.  Upon information and belief, Ms. Umbarger-Wells also bragged that she "got rid of" Dr. Andrews.

94. Dr. Andrews is an educated and respected professional and spent years serving her community, building a positive reputation, and completing her substantial education. Ms. Umbarger-Wells' false comments damaged Dr. Andrews' personal and professional reputation and were made in direct retaliation for Dr. Andrews filing her charge of discrimination with the EEOC and for making prior internal complaints regarding the same.

95. Upon information and belief, Ms. Umbarger-Wells was not counseled or disciplined, yet again.

96. Virginia Tech engaged in discriminatory practices with malice or reckless indifference to the federally protected rights of Dr. Andrews, and would not have taken the discriminatory actions against her but for Dr. Andrews' race.  Due to the acts and omissions of Virginia Tech, Dr. Andrews was discriminated against, retaliated against, and suffered a hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.

## COUNT I:  CLAIM FOR TITLE VII RACE DISCRIMINATION

97. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

98. Dr. Andrews identifies her race as Black.

99. At all times material hereto, Virginia Tech had an obligation to maintain a work environment that was not charged with racial discrimination and hostile to Dr. Andrews and other minority employees.

100.    Virginia Tech violated federal law by creating and permitting a work environment to exist that was discriminatory and hostile to Dr. Andrews and other minority employees, and by wrongfully constructively discharging Dr. Andrews.

101.    The above-referenced employees were acting in the course and scope of their employment with Virginia Tech at the time of their actions; therefore, Virginia Tech is liable for their actions under the doctrine of *respondeat superior*.  Their actions against Dr. Andrews were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

102.    As a direct and proximate result of Virginia Tech's actions, Dr. Andrews has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

103.    At all times material hereto, Virginia Tech engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Dr. Andrews so as to support an award of punitive damages.

104.    Prior to Dr. Andrews' separation of employment with Virginia Tech, Dr. Andrews was performing her work at a satisfactory level and meeting or exceeding Virginia Tech's legitimate business expectations.

105.    Any reasons cited by Virginia Tech for Dr. Andrews' discipline were pretextual as Dr. Andrews' work performance was meeting legitimate business

expectations.

106.     The above-described acts by Virginia Tech constitute racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.

107.     Dr. Andrews is entitled to all reasonable costs, including attorneys' fees, associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

**COUNT II: CLAIM FOR TITLE VII HOSTILE WORK ENVIRONMENT**

108.     Dr. Andrews incorporates by reference herein the preceding paragraphs of this Complaint.

109.     At all times material hereto, Defendant had an obligation to maintain a work environment that was not charged with racial discrimination and hostile to Dr. Andrews and other minority employees.

110.     Defendant violated federal law by creating and permitting a work environment to exist that was discriminatory and hostile and offensive to Dr. Andrews and others, and by discriminating against Dr. Andrews.

111.     The above-referenced employees were acting in the course and scope of their employment with Virginia Tech at the time of their actions, therefore, Virginia Tech is liable for their actions under the doctrine of *respondeat superior*.  Their actions against Dr. Andrews were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

112.     Dr. Andrews was subjected to unwelcome conduct based upon race.

113.     Dr. Andrews witnessed Caucasian employees being treated differently from, and better than minority employees, including herself.  Such disparate treatment included lack of training, racially motivated comments, hostile co-workers, exclusion,

different work duties, work conditions, promotion and salary standards, contrasting disciplinary standards, and work requirements.

114.     Dr. Andrews witnessed and experienced multiple instances of racially discriminatory comments and actions during her employment.

115.     Dr. Andrews observed that she was subjected to discriminatory treatment and harassment that employees of other races did not experience.  Not only was this treatment discriminatory but it was so severe and pervasive as to alter the conditions of Dr. Andrews' employment and create a hostile or abusive working environment.

116.     Dr. Andrews made multiple complaints about this environment.  Her complaints were ignored.

117.     As a direct and proximate result of Virginia Tech's actions, Dr. Andrews has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

118.     At all times material hereto, Virginia Tech engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Dr. Andrews so as to support an award of punitive damages.

119.     At all times relevant, Dr. Andrews performed her work at a satisfactory level, meeting or exceeding Defendant's legitimate business expectations.

120.     The above-described acts by Defendant constitute a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.

121.     Dr. Andrews is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT III:  CLAIM FOR TITLE VII RETALIATION

122.     Dr. Andrews incorporates by reference herein the preceding paragraphs of this Complaint.

123.     At all times material hereto, Virginia Tech had an obligation to maintain a work environment that was not charged with racial discrimination and hostile to Dr. Andrews and other minorities.

124.     Dr. Andrews was subjected to systemic discrimination based upon race, a hostile work environment, and retaliation for raising concerns about a work environment rife with racial discrimination.

125.     Dr. Andrews witnessed Caucasian employees being treated differently from, and better than minority employees, including herself.   Such disparate treatment included lack of training, racially motivated comments, hostile co-workers, exclusion, different work duties, work conditions, promotion and salary standards, contrasting disciplinary standards, and work requirements.

126.     Dr. Andrews witnessed and experienced multiple instances of racially discriminatory comments and actions during her employment.

127.     Dr. Andrews observed that she was subjected to discriminatory treatment and harassment that employees of other races did not experience.   Not only was this treatment discriminatory but it was so severe and pervasive as to alter the conditions of Dr. Andrews' employment and create a hostile or abusive working environment.

128.     Dr. Andrews engaged in the protected activity of complaining about this discriminatory and hostile work environment on a myriad of occasions.

129.     In direct retaliation for these complaints, Dr. Andrews has suffered instances of retaliation, including but not limited to, further disparate treatment,

ostracization, being the subject of a false sexual harassment complaint, the scapegoat of a financial audit, and a constructive discharge.

130.    The above-referenced employees were acting in the course and scope of their employment with Virginia Tech at the time of their actions, therefore, Virginia Tech is liable for their actions under the doctrine of *respondeat superior*.  Their actions against Dr. Andrews were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

131.    As a direct and proximate result of Defendant's actions, Dr. Andrews suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

132.    At all times relevant, Dr. Andrews performed her work at a satisfactory level, meeting or exceeding Defendant's legitimate business expectations.

133.    At all times material hereto, Defendant engaged in a retaliatory practice or practices with malice or reckless indifference to the federally protected rights of Dr. Andrews so as to support an award of punitive damages.

134.    The above-described acts by Defendant constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.

135.    Dr. Andrews is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

WHEREFORE, Plaintiff Kimberly Renae Andrews prays for judgment against Defendant Virginia Polytechnic Institute and State University | Commonwealth of Virginia, and for equitable relief, compensatory damages, punitive damages, together with prejudgment interest, post-judgment interest, back pay, front pay, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

TRIAL BY JURY DEMANDED

Respectfully submitted,

**KIMBERLY RENAE ANDREWS**

/s/Thomas E. Strelka
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
STRELKA LAW OFFICE, PC
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA  24011
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com

*Counsel for Plaintiff*