CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 1 2 2020

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

KIMBERLY RENAE ANDREWS, )
)
    Plaintiff, )
)
    Civil Action No. 7:18CV00281
v. )
)
    **MEMORANDUM OPINION**
VIRGINIA POLYTECHNIC INSTITUTE )
AND STATE UNIVERSITY and )
    By: Hon. Glen E. Conrad
COMMONWEALTH OF VIRGINIA, )
    Senior United States District Judge
)
    Defendants. )

On June 19, 2018, Dr. Kimberly Renae Andrews filed a three-count complaint against

Virginia Polytechnic Institute and State University and the Commonwealth of Virginia

(collectively, "Virginia Tech"). Each of Dr. Andrews' claims arises under Title VII of the Civil

Rights Act of 1964, as codified under 42 U.S.C. §§ 2000e, et seq., ("Title VII"). Count I alleges

race discrimination, Count II is a claim that Dr. Andrews was subject to a hostile work

environment, and Count III alleges retaliation for raising concerns about race discrimination.

Virginia Tech has moved for summary judgment, and Dr. Andrews has opposed that motion. At

oral argument on the motion, counsel for Virginia Tech waived its right to reply. Since then, both

Virginia Tech and Dr. Andrews have filed motions in limine. For the reasons stated, the court will

grant Virginia Tech's motion for summary judgment and dismiss Dr. Andrews' claims. On that

basis, the court will dismiss the parties' motions in limine as moot.

**Background**

Virginia Tech hired Dr. Andrews, an African-American woman, as its Director of Upward

Bound and Talent Search in mid-2012. She later received a title change to "Director of TRIO

Programs." Dr. Susan Short, a white woman who eventually became Dr. Andrews' supervisor,

was part of the search committee that hired Dr. Andrews. ECF No. 35-1, Deposition of Dr.

Kimberly Andrews ("Andrews Dep."), 25:13–21; ECF No. 35–12, Deposition of Susan Short ("Short Dep."), 11:15–20, 12:10–16:10.

TRIO is a federally funded program, and encompasses other government outreach and student programs designed to identify and provide services for individuals from disadvantaged backgrounds. Dr. Andrews' duties involved overseeing that program, and serving low income and first generation students in middle school and high school, which aimed to prepare them for post-secondary education. Short Dep. 21:24–24:3; Andrews Dep. 26:1–20. She supervised approximately 25 employees. Andrews Dep. 113:2–14.

On the whole, Dr. Andrews received favorable performance reviews from Dr. Short, although they had a "kind of distant" relationship. Andrews Dep. 20:20–21:4, 43:2–7; Short Dep. 18:13–19:7. In addition, Dr. Andrews received raises throughout her five years of employment. Andrews Dep. 26:13–27:10. She never received any type of discipline or sanction based on any Virginia Tech policy violations. Id. 33:1–34:10. No evidence shows that Virginia Tech ever demoted her, cut her pay, or changed her job duties or responsibilities. See, e.g., id. 45:24–46:20. However, Dr. Andrews testified that there were times in which she had a "stressed, strained relationship" with Dr. Short, and eventually reached the "feeling that the environment was becoming more hostile," specifically, "stand-off-ish." Id. 82:1–86:17. At some point in her employment, Dr. Andrews wanted to attend mediation with Dr. Short regarding their relationship, but Dr. Short declined. Id.

At her deposition, Dr. Andrews recounted a series of workplace difficulties and administrative problems that she attributed to her race. For example, at the outset of Dr. Andrews' employment, Dr. Short informed Dr. Andrews that she would reach out to Dr. Andrews' parents to "get their blessing" to hire Dr. Andrews. Andrews Dep. 19:15–20:4. Dr. Andrews also testified

2

that she did not receive sufficient onboarding or training when she started, and was not provided with professional development unless she requested it. Meanwhile, she stated that other employees of different races received more training than she did, but could not say "definitively" that her white predecessor or successor had. Id. 47:13–52:22. Dr. Andrews testified that she thought that she received less training because of her race, based solely on her "belief." Id. Virginia Tech did have a faculty handbook, which Dr. Andrews knew about when she was hired, but she only read it after she was well into her employment. Id. 113:22–114:7. Dr. Short, however, testified that Virginia Tech's training was done at a university-wide level, and that there was no specific training guide for Dr. Andrews' unit. Short Dep. 20:6–21:23. Another employee testified that "difficulties" regarding training "frankly[] happen[] a lot with an institution this size." ECF No. 35-5 Deposition of Jason Puryear ("Puryear Dep.") 17:10–12.

In addition, Dr. Andrews testified that Dr. Short ceased introducing her to new people at meetings, and originally only introduced her to people of color, a pattern about which Dr. Andrews questioned Dr. Short. Andrews Dep. 52:23–57:3. As a result, Dr. Andrews had the "belief" that her division was isolated. Id. 58:18–61:11.

Similarly, Dr. Andrews attributed failures to advance within Virginia Tech to her race. At certain times, Dr. Andrews asked Dr. Short to change her job title from Director to Executive Director, and promote her Assistant Directors to Directors "upon the completion of additional grant securing." She testified that Dr. Short told her that the position of Executive Director did not exist, "but she would look into it." Dr. Andrews never received the title change. Andrews Dep. 27:18–32:22; 178:3–16. Puryear testified that Dr. Andrews' former unit has no executive director, but recalled talk of creating that position during a conversation about "reorganizing and reconfiguring the office" if it received more grant money. Puryear Dep. 48:18–24. In unrebutted

3

testimony, Dr. Short testified that she had no unilateral authority to grant that promotion. Short Dep. 56:7–57:18.

Dr. Short also testified that other departments at Virginia Tech had executive directors, but that those executive directors had a Ph.D. Dr. Andrews did not have a Ph.D. during her employment there. Id. 66:16–67:3. However, Dr. Short testified that she "encourage[d]" Dr. Andrews to complete her Ph.D. Id. 8:13–19, 67:4–68:9. For example, Dr. Short allowed Dr. Andrews to travel to Texas every other Friday to complete her Ph.D. coursework. Dr. Andrews did not have to take leave when she missed work to attend Ph.D. classes. Andrews Dep. 22:20–25:12. Dr. Andrews further testified that, while she served on hiring committees within her unit, she made several requests to Dr. Short to place her on other committees. She never received a placement outside of her unit. Dr. Andrews testified that she thought this was due to race, but provided no evidence to that end. She was aware of non-black people who had been placed on committees, but could not speak to the total racial composition of the groups. Id. 79:11–81:24. Similarly, Dr. Andrews testified that she was not given a pay raise despite securing significant grant funding for the TRIO programs. Id. 181:21–183:8; 187:2–16.

Dr. Andrews also testified that, upon her hiring, her office space was "[d]eplorable." Id. 93:11–12. Dr. Short acknowledged that the area needed to be renovated and informed Dr. Andrews: "I know what your office space looks like. We're going to do something about it." Id. 93:3–94:18; ECF No. 35-3 at 3. The facilities had several issues, including water leaks, pests, and wall cracks. Certain of these issues existed before Dr. Andrews arrived, and her predecessor, a white male, had occupied the same space. Andrews Dep. 93:6–14. ECF No. 35-2, Deposition of Arlethea Scott ("Scott Dep.") 26:10–27:6. After waiting about two years, Dr. Andrews played an active role in the renovation of her office space, choosing carpeting, paint, furniture, and tile, for

4

example. Andrews Dep. 93:12–97:14.

In addition to renovating her office space, Dr. Andrews wanted to increase diversity in her unit. She testified that she hired four black employees, one Hispanic employee, and one white employee during the time she was employed. Id. 63:12–72:23. Dr. Andrews did not think her unit was diverse when she arrived, but she did think it was when she left. Id. 72:24–73:4. Dr. Andrews, however, believed that Virginia Tech slow-walked her attempts at diversifying her unit. For example, Dr. Andrews testified that paperwork for her white subordinate, Sarah Umbarger-Wells, was processed faster than hers. Dr. Andrews attributed this difference to race without elaboration. Id. 74:19–76:19. She also attributed edits to a 2016 job posting she had made to her "belief" that the changes were made based on her race. Id. 76:15–79:10; Compl. ¶ 26. Dr. Andrews also stated that high-level positions within Virginia Tech were not granted an administrative designation that specifically targeted them for minority recruiting. Andrews Dep. 179:13–180:20.

One of Dr. Andrews' subordinates, Arlethea Scott provided information that Latino employee Jason Puryear was championed by Dr. Andrews to be promoted to Assistant Director for Upward Bound and had discussions with Puryear regarding an increase in pay based on the promotion. ECF No. 35-4, Scott Dec. ¶¶ 5–6. However, Dr. Short "gave Dr. Andrews a great deal of pushback because Dr. Short did not believe Mr. Puryear," a minority employee, "was worth the raise." Id. at ¶ 7. Scott believed Dr. Short's opinion of Puryear was "fueled by discrimination on the basis of race." Id. Puryear, however, received the promotion. Within her declaration, Scott also described another personnel issue that she believed was affected by a discriminatory animus on the basis of race. According to Scott, Dr. Short pushed for the hire of Julie Weddle, who is Caucasian, as a Project Advisor, a position lower than Puryear's new position of Assistant Director in the chain of command. Id. ¶ 8. Without providing specific evidence, Scott stated that Weddle's

race "made all the difference with Dr. Short," and that Virginia Tech paid Weddle a higher salary than Puryear. Id. ¶¶ 8–9. Scott also related that: "There has existed a culture at Virginia Tech that is hostile to non-Caucasian employees and favors Caucasian employees."[1]

Dr. Andrews also described difficulties regarding communication, which she also believed stemmed from her race. As a direct report to Dr. Short, Dr. Andrews participated in monthly one-on-one meetings to discuss various topics and to stay in touch. Short Dep. 56:7–11. During certain of these monthly meetings, Dr. Short advised Dr. Andrews on how to handle issues with Dr. Andrews' subordinate employees. Short Dep. 28:1–30:1. While Dr. Andrews alleges that Dr. Short cancelled additional "walking" meetings Dr. Andrews requested, Dr. Andrews testified that she did not know whether Dr. Short met more often with other direct reports. Andrews Dep. 21:5–22:9. For her part, Dr. Short testified that she held no one-on-one walking meetings with any employees, although she did have one-on-one meetings with Dr. Andrews and other directors. Short Dep. 26:6–22. Even though Dr. Short cancelled certain meetings with her, Dr. Andrews acknowledged that Dr. Short responded regularly to her emails. Nevertheless, Dr. Andrews felt "isolated" due to these cancellations. Dr. Andrews attributed these cancelled meetings, including those in which Dr. Short had an appointment related to her cat or family obligations, to race, again based on a "gut feeling" and a "belief." Andrews Dep. 86:9–87:4; 101:19–103:20; 106:6–8.

---

[1]    At oral argument, counsel for Virginia Tech protested consideration of Scott's declaration on summary judgment. The "sham affidavit rule" permits a court at summary judgement to discount post-deposition affidavits that present a "conflicting version" of an affiant's deposition testimony. See Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 974–76 (4th Cir. 1990); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 n.7 (4th Cir. 2001).

The court finds no true inconsistencies between Scott's testimony and her declaration, and thus, the sham affidavit rule does not preclude consideration of Scott's affidavit. Scott was not questioned about the hiring of Puryear or Weddle. She also was not questioned about any pay disparities or retaliation at Virginia Tech. Accordingly, there is no inconsistency in the portions of Scott's affidavit that address those topics. See Spriggs, 242 F.3d at 185 n.7 ("[T]he deposition testimony addresses only those complaints conveyed by 'letters' or 'communications' . . . Oral complaints . . . were patently outside the scope of the questioning."); Smith v. Autozone, Inc., No. 7:15-CV-00183, 2016 WL 4718184, at *5 (W.D. Va. May 13, 2016) ("[W]hile the above statement may expand on Smith's deposition testimony, there is no 'flat contradiction of material fact' that would invoke the sham affidavit rule.").

Furthermore, Dr. Andrews testified that Virginia Tech never obtained—during her employment—a widely-used database called Blumen that she had requested. A technical specialist within Virginia Tech told her that a compatibility issue caused the delay. Dr. Andrews did not believe the specialist because other schools used Blumen, but acknowledged that she was "not a technology guru." Id. 89:3–92:13. Contemporaneous emails and testimony describe security issues with Blumen. ECF No. 35-15 (listing concerns with data security, and planning meetings to find a "viable path forward"); Short Dep. 38:18–39:16 ("The purchase and acquisition of Blumen at the university was denied on multiple levels because Blumen software package at the time did not meet Virginia Tech's security standards in relationship to student information. . . . And Blumen admitted that they did not have the safeguards in it that would meet the university's standards regarding privacy safety and security."). Dr. Andrews' white successor, who started about six months after Dr. Andrews left Virginia Tech, received approval to purchase the program after Blumen had addressed the security issues. Short Dep. 39:17–40:1 ("Blumen modified the application to address, across the university, the questions that we had in relationship to the safety and security of student information."); Puryear Dep. 25:15–26:18, 46:5–20 (testifying that he noticed "nothing that was different" between the Blumen approval process and the process for another program). Dr. Andrews attributed Virginia Tech's reluctance to procure Blumen to her race, based on her "belief." Andrews Dep. 92:4–13.

In 2016, Virginia Tech audited the entire Division of Outreach and International Affairs as part of a "periodic review," which included the TRIO program supervised by Dr. Andrews. Short Dep. 59:5–61:20; Andrews Dep. 35:18–37:5. Dr. Andrews did not know whether this was a routine audit or whether other departments were audited as well, but had a "suspicion"—her "belief" and "gut feeling"—that the audit was due to her race. Andrews Dep. 37:24–42:2, 44:22–

7

45:11. Although the audit revealed some issues with missing documentation, Dr. Andrews experienced no pay cut, title change, or other formal sanction as a result of the audit. Id. 45:24– 46:8; ECF No. 35-16. She believed the audit arose from problems with a white employee whom Dr. Andrews supervised, Assistant Director Sarah Umbarger-Wells. Andrews Dep. 39:14–18. Apparently, Umbarger-Wells had some attendance issues, and Dr. Andrews wanted to discharge Umbarger-Wells. Dr. Short disagreed, saying that she "didn't think it would be a good idea." Id. 108:1–110:4.

Dr. Andrews and other witnesses also described certain allegedly, racially-tinged remarks and incidents. To begin, Dr. Andrews testified that she had heard, via another employee, that Umbarger-Wells had made disparaging comments about Historically Black Colleges and Universities ("HBCUs"), to the effect that they were "dirty" or "filthy," at an undefined point in Dr. Andrews' employment. Dr. Andrews reported this to Dr. Short, but neither disciplined Umbarger-Wells. Id. 110:14–113:1. Dr. Andrews, however, did later tell Umbarger-Wells that her comments were inappropriate. Id. 144:6–17. Similarly, Dr. Andrews recounted Dr. Short stating, while driving past an HBCU, that the "football field area, the bleachers, and the stadium," as well as the neighborhood in general, "looked 'unsafe.'" Id. 145:20–150:15. Dr. Andrews also mentioned at her deposition an incident in which a white co-worker questioned her use of the word "impactful," asking "Is that a word?" Dr. Andrews also attributes this question to race, based again, on a "feeling," and because no other employee had received similar questions. She mentioned this event to Dr. Short, but to her knowledge, Dr. Short failed to follow up on it. Id. 87:19–89:2.

In addition, Jason Puryear, a fellow Latino employee recalled Umbarger-Wells asking him if he had "seen or visited the local taco truck." Puryear Dep. 12:4–7, 20:14–16. Puryear further

stated "I don't know if [she] meant this to be racist or discriminatory, or if your first thought, when you saw me, just went straight to tacos. . . . it was out of, at the very least, extreme ignorance and, I think blindness to it." Id. 20:14–21:3.

Further, Dr. Andrews testified that Dr. Short referred to her on occasion as "girl," as in "Well, you go, girl," "Girl, I didn't mean anything by that," or "I was just kidding, girl," although Dr. Short apologized and Dr. Andrews could not recall her using the term afterwards. Andrews Dep. 126:17–128:22; Scott Dep. 19:19–21:11 (testifying that the word "gal" or "girl" was "tossed around"). Dr. Short explained that she used the term to refer to "[a]ny female that I would interact with" as "perhaps a term of endearment," a usage she attributed to growing up in western Maryland. Short Dep. 43:5–11.

Dr. Andrews also recounted comments "that might have had a cultural feel" or "cultural twist." For example, Dr. Short made comments about Dr. Andrews' shoes, such as "I can't believe you're wearing shoes that high to work" and "I can't believe you're wearing those open-toed shoes." At other times Dr. Short commented on her clothes, stating: "Well, that's different" in response to an African-inspired dress; and made "comments about [Dr. Andrews'] hair." Andrews Dep. 128:23–131:21. In contrast, when she wore "flats, dark clothing, drab clothing, there were no comments." Id. 130:12–21. It was Dr. Andrews' "belief" that these comments were racially motivated, but she could not say whether Dr. Short commented on other employees' clothing as well. Id. 131:12–132:12.

Another conversation took place in the context of comments that Dr. Andrews had worn "some shorts, tennis shoes, something of that nature, but not the business attire that everyone else had on" at a "directors' meeting" in her first year of employment. Andrews Dep. 132:13–137:20, 139:10–17 (Dr. Eley-Sanders said that Dr. Andrews' attire was "inappropriate for a meeting. Some

9

people were concerned."); Puryear Dep. 33:11–24 (Dr. Andrews was "definitely less dressed up than the rest of the directors . . . ."). After complaints by a student, among others, Dr. Karen Eley-Sanders, an African-American woman then serving as a Chief Diversity Officer within Virginia Tech's school of medicine, spoke to Dr. Andrews about her clothing. ECF No. 35-13, Deposition of Dr. Karen Eley-Sanders 4:18–6:6, 11:11–16:16 (testifying that a student had mentioned Dr. Andrews' dress, and that: "There were occasions when I believe that she was dressed as an executive. There were times when I think she dressed like an undergraduate student."); Compl. ¶ 51. According to Dr. Andrews, Dr. Eley-Sanders told her that changing her behavior could make "not black" people "more comfortable having more blacks in the unit," essentially acting as a "door opener for black people." Andrews Dep. 133:22–134:17, 139:10–140:15. Dr. Andrews took this as a "stupid comment" rather than racially motivated, because she was taking part in a summer camp. Id. Dr. Andrews' complaint alleges that this incident took place in the summer of 2012, although the record evidence is unclear. Compl. ¶ 51.

In the same vein, Dr. Andrews testified about a conversation held at a 2017 quarterly meeting on diversity and inclusion. At this meeting, two white people recounted their personal experiences regarding race, including one man "whose wife told him he was a racist," and a woman who indicated that in her community: "We didn't really accept blacks, but when a girl went off and got pregnant by a black, we accepted the baby." Similarly, a woman stated that she had travelled to Africa to know "what it's like to be a 'minority' and to be the only person of color in a place, and [that] she felt 'vulnerable' and scared." Id. 152:10–153:10. Dr. Andrews was offended and testified that people talking about "their racist issues, their racist background, their connection to racism and their history growing up," as well as the topic's position on the meeting agenda, indicated that the matter was not being taken seriously. Id. 152:9–154:9.

10

Puryear also testified that Dr. Andrews had "express[ed] frustration" regarding comments about her hair. Puryear Dep. 33:1-10. Scott, an African-American woman hired by Dr. Andrews, recounted that Dr. Andrews had told her people were "talking about mud pies" at meetings, which Scott characterized as a derogatory term. Scott Dep. 11:16–12:14. Scott further relayed her own experience of having her hair touched, and that it was "very derogatory" to black people: "We're not pets." Scott Dep. 13:7–24. Likewise, Pamela White, executive director for Equity and Access, testified that "for whatever reason often times white women have fascinations about black women and their hair and they will walk up and touch your hair uninvited and unwelcomed. So that is an issue that I have heard—I have experienced myself and I have heard other black women talk about." ECF No. 35-6, Deposition of Pamela White ("White Dep.") 12:22–13:10.

Virginia Tech has a written policy against racial discrimination and retaliation. Id. 26:4–10; ECF No. 35-10, Deposition of Nikeshia Arthur ("Arthur Dep.") 5:20–6:3. Multiple Virginia Tech employees explained Virginia Tech's discrimination complaint process to Andrews and invited her to file a complaint, but she declined. Specifically, Andrews discussed her perceptions of discrimination with White, Rodney Irvin (Director of Employee Relations), and Arthur (Civil Rights Compliance Officer). Andrews Dep. 118:4–122:12; ECF No. 31-6, Deposition of Rodney Irvin ("Irvin Dep.") 11:1–12:22; 15:1–5; Arthur Dep. 14:7–15:6. Dr. Andrews testified that she feared filing complaints would result in retaliation, based on "[j]ust a feeling." Andrews Dep. 118:2–124:24. Irvin, upon hearing her complaints, told Dr. Andrews that she should "make sure that [she] had all of [her] i's dotted and [her] t's crossed because you know how it is here and there's the possibility that you could be retaliated against based on what you're experiencing." Id. 121:16–24 (quotation marks omitted, capitalization modified). Dr. Andrews testified, however, that she did not take Irvin's statement as "discouragement" to file a complaint, and that she was

not aware of any specific instances of retaliation. Id. at 122:1–12. After their conversation, Irvin took Dr. Andrews to White's office to discuss filing a complaint, because he believed that the matter raised Title IX issues that were within White's purview. White Dep. 8:20–9:17; Irvin Dep. 12:11–17:19.[2] Other witnesses also testified regarding fears of retaliation at Virginia Tech. Scott Decl. ¶¶ 4, 16; White Dep. 10:3–20 (recounting "a general sentiment" of fears of retaliation among black employees); Arthur Dep. 27:11–29:11.

Umbarger-Wells made a sex discrimination claim against Dr. Andrews in February 2017. The Virginia Tech official who conducted the investigation, Nikeshia Arthur, testified that the investigation stemmed from supposed comments by Dr. Andrews to Umbarger-Wells to the effect that Umbarger-Wells should wear more revealing clothes, and her "best assets" were her breasts. Arthur Dep. 12:7–18:10. Dr. Andrews confirmed that this was the substance of the complaint, and that it involved some comment related to "oral sex." Andrews Dep. 156:16–157:14. At her deposition, Umbarger-Wells confirmed the same. ECF No. 35-9, Deposition of Sarah M. Umbarger-Wells ("Umbarger-Wells Dep.") 11:3–13:11.

Dr. Andrews maintained that the allegations were false. She was ultimately exonerated after the investigation, and faced no discipline or other adverse action as a result of it. Andrews Dep. 158:3–4; 161:11–162:4; Arthur Dep. 18:1-10 (testifying that "[t]here was a finding that there was insufficient evidence to raise an inference of a policy violation" for some statements, and that those statements that were corroborated did not create enough evidence to find that Umbarger-Wells had suffered a hostile work environment). Dr. Andrews "believe[d]" the complaint was retaliation by Umbarger-Wells against Dr. Andrews for talking to Irvin or to a different Virginia Tech employee, Karissa Moore. Andrews Dep. 159:23–160:17; Compl. ¶ 71 (alleging that Dr.

---

[2]    Dr. Andrews testified that this conversation took place before she later left Virginia Tech on medical leave, but she could not recall how long before. Andrews Dep. 125:9–24.

Andrews spoke with Moore in 2016). No record evidence shows that Umbarger-Wells was aware of Dr. Andrews' meeting with Irvin or other complaints, although Scott also believed it was retribution. Umbarger-Wells Dep. 8–11; Scott Decl. ¶ 11.

Dr. Andrews filed her EEOC complaint on June 1, 2017. ECF No. 31-3. She testified that she began feeling depression-like symptoms related to her perceptions of racism in the spring of 2017, and reached out to Virginia Tech's Employee Assistance Program ("EAP") and a counselor after crying at work. Andrews Dep. 163:21–173:10. She took medical leave beginning June 5, 2017. Compl. ¶ 91. Dr. Andrews' counseling intake form is largely redacted, but lists "coping with perceived racism"—surrounded by redactions—as one of the reasons she sought counseling, and under "Angers," she lists "[s]ome white people" followed by other extensive redactions. ECF No. 32-2. In a further counseling form, Dr. Andrews describes her chief complaint as feeling "[o]verworked—not taking care of self, "I love my job," and that she "[c]ontinues to go over everything she has to do." ECF No. 35-5.

Dr. Andrews did not return from medical leave and resigned from Virginia Tech on June 20, 2017. Compl. ¶ 92. She wanted to leave what she "felt was a hostile and racially discriminatory environment." Andrews Dep. 171:13–22. For her part, Dr. Short was "surprised" when Dr. Andrews took medical leave and resigned. She testified that she had seen significant growth in Dr. Andrews' program and performance. Short Dep. 48:17–49:24.

## **Standard of Review**

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the non-moving party must set forth specific, supported facts demonstrating that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

13

Fed. R. Civ. P. 56(c). "When a party fails to establish the existence of an element essential to that party's case, there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." Perkins v. Int'l Paper Co., 936 F.3d 196, 205 (4th Cir. 2019) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. Courts must view "the facts in the light most favorable to, and draw[] all reasonable inferences in favor of," the non-movant. EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 174 (4th Cir. 2009) (internal quotation marks omitted). In addition, courts may not weigh the evidence if there are genuine issues of material fact. Anderson, 477 U.S. at 249. "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson, 477 U.S. at 248). But "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991).

The United States Supreme Court has stated that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp., 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). Accordingly "Rule 56 must be construed with due regard" for both movants and non-movants, including the "rights of persons opposing [] claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." Id.

14

However, the United States Court of Appeals for the Fourth Circuit has "never held that a weak case is necessarily one that should be disposed of on summary judgment." Hoyle v. Freightliner, LLC, 650 F.3d 321, 334 (4th Cir. 2011). The question, thus, "is not whether a jury is *sure* to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find." Id. (emphasis in original).

**Discussion**

Title VII prohibits discrimination "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, a plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the burden-shifting framework of McDonnell Douglas Corp. v. Green. Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Under the familiar burden-shifting framework, the plaintiff must first establish a prima facie case of discrimination. After the prima facie showing is made, the burden then shifts to the employer to show that its purportedly discriminatory action was in fact the result of a legitimate non-discriminatory reason. Foster, 787 F.3d at 250. If the employer makes this showing, the burden then shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purportedly legitimate reasons were not its true reasons, but were a pretext for discrimination. Id.

## I.     **Hostile Work Environment**

"Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." E.E.O.C. v. R&R Ventures, 244 F.3d 334, 338 (4th Cir. 2001). A plaintiff may survive summary judgment on a race-based hostile work

15

environment claim where she provides evidence that would allow a reasonable jury to find that four elements have been established. One, she experienced unwelcome harassment. Two, the harassment was based on her race. Three, the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. And four, there is some basis for imposing liability on the employer. Perkins, 936 F.3d at 207–08. Virginia Tech primarily argues that Dr. Andrews cannot prove the third element of this claim. The court agrees that Dr. Andrews' evidence would not allow a reasonable jury to find severe or pervasive harassment.

The severe or pervasive element has both a subjective and objective component. Cent. Wholesalers, Inc., 573 F.3d at 175. Dr. Andrews must show that she "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile" under the circumstances. Id. "[W]hen determining whether the harassing conduct was objectively severe or pervasive, [courts] must look at all the circumstances . . . ." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008) (internal quotation marks omitted). Factors to consider "includ[e] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (internal quotation marks and citations omitted). "[P]laintiffs must clear a high bar in order to satisfy the [objective] severe or pervasive test." Id. "[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." Id. "[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." Id. at 315–16 (internal quotation marks and citations omitted). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)

(internal quotation marks and citations omitted).

"In determining whether offensive conduct can be attributed to discrimination against the employee's race or other protected status, courts must view the behavior in light of the social context surrounding the actions." Strothers v. City of Laurel, Maryland, 895 F.3d 317, 329 (4th Cir. 2018) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). The court's inquiry, thus, must account for who Dr. Andrews is: an African-American woman. While the court analyzes this evidence in "categories," its view is towards the "totality" of Dr. Andrews' experiences in evaluating her claim. See Perkins, 936 F.3d at 211.

### a.   **Verbal Statements**

The court first addresses the verbal statements at issue in this case. The use of diminutives such as "boy" or "girl" towards black men and women, in the context of American history, may be offensive. Indeed, the Supreme Court has recognized that the term "boy," when used to refer to African-American men, may constitute evidence of racial animus. Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006). Such a determination, however, depends on factors. "Although it is true" that "boy" "will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." Id.; Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 n.4 (4th Cir. 2015) (use of term "little girl" by a white employee in reference to an African-American employee could be viewed as racial discrimination).

In this case, Dr. Andrews' own testimony describes events that no reasonable jury could attribute to severe racial animus when viewed in context, especially when Dr. Short stopped using the word after being asked. Andrews Dep. 126:17–128:22 ("Well, you go, girl," "Girl, I didn't

17

mean anything by that," and "I was just kidding, girl"). The context of these statements is far removed from that in Boyer-Liberto. In that case, the Fourth Circuit noted that the plaintiff's supervisor had "employed racial epithets to cap explicit, angry threats that she was on the verge of utilizing her supervisory powers to terminate" the employee, and had criticized her job performance before threatening and hurling racial epithets at her. When the employee attempted to report the harassment, the supervisor threatened her again. Boyer-Liberto, 786 F.3d at 279–80.

In contrast, this case presents unrebutted testimony that Dr. Short used the term to refer to "all females," not just black women, and the phrases recounted by Dr. Andrews are not critical or threatening. The court concludes that, in this case, Dr. Short's use of the word "girl" to refer to Dr. Andrews is insufficient evidence for a reasonable jury to find severe or pervasive race-based harassment in itself. The "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." Harris, 510 U.S. at 21 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). However, for the purposes of this motion, the court assumes that a jury could find these statements constituted some harassment, viewing the record in the light most favorable to Dr. Andrews. Ash, 546 U.S. at 456 ("Insofar as the Court of Appeals held that modifiers or qualifications are necessary in all instances to render ["boy"] probative of bias, the court's decision is erroneous.").[3]

Dr. Andrews also relies on other statements she believes to have touched on racial issues. The record fails to show that Dr. Andrews was aware of some of these statements during her employment, Umbarger-Wells' alleged question to Puryear regarding a taco truck, for example.

---

[3]     Without further guidance from appellate courts, the court declines to rule, as a matter of law, whether use of the term "girl" to African-American women provides the same evidence of racial animus as use of the word "boy" toward African-American men.

These comments, thus, are not proper evidence of a hostile work environment. Perkins, 936 F.3d at 210. The court will consider, however, Dr. Short's description of an HBCU as appearing "unsafe" and Umbarger-Wells' purported statement that HBCUs were "dirty."[4] In addition, the court looks to Dr. Andrews' description of a 2017 confessional meeting in which employees, perhaps in less than ideal terms, talked through difficult issues regarding race. The court does not believe that these statements, viewed in their "social context," Strothers, 895 F.3d at 329, necessarily rendered Virginia Tech a hostile workplace. At this juncture, however, the court views them in the light most favorable to Dr. Andrews, and assumes that they could be objectively racially offensive. Puryear Dep. 32:2–14 ("So, again, this is one of those things where, you wonder if comments are made from a place of malice or from a place of ignorance."). But even assuming that Dr. Andrews was aware of all of the relevant statements during her employment, a "handful" of incidents over a five-year employment alone fail to provide sufficient grounds for finding "severe or pervasive" harassment. Perkins, 936 F.3d at 209; Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753–754 (4th Cir. 1996) (conduct occurred "intermittently over a seven-year period, with gaps between incidents as great as a year").

**b.  Hair Touching**

Next, the court considers the allegations regarding hair. Hair can present a target of racial harassment under Title VII. See generally Jenkins v. Blue Cross Mutual Hospital Insurance, Inc., 538 F.2d 164, 168 (7th Cir. 1976) (en banc) (recognizing a claim for racial discrimination based

---

[4]     As stated during oral argument, the court declines to consider the hearsay statement contained in Scott's deposition, that Dr. Andrews had recounted to Scott that she had heard the term "mud pies" in a meeting. See Fed. R. Civ. P. 56(c)(4); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affidavits cannot be conclusory or based upon hearsay.") (citations omitted). In any case, Dr. Andrews has not provided evidence of the context in which that term was used, such that a jury could infer racial animus. The court is not required to speculate as to whether the facially-neutral phrase referred to desserts, children's games, or ethnic groups. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988) (A non-movant "may not escape summary judgment in the mere hope that something will turn up at trial.").

on the plaintiff's allegation that she was denied a promotion because she wore her hair in a natural Afro); *but cf.* Equal Employment Opportunity Comm'n v. Catastrophe Mgmt. Sols., 852 F.3d 1018, 1032 (11th Cir. 2016) ("As far as we can tell, every court to have considered the issue has rejected the argument that Title VII protects hairstyles culturally associated with race."). In their depositions, White and Scott testified that white employees "sometimes" touched their hair without asking. White attributed this touching to "fascinations" with black women's hair. There is, however, no admissible evidence that Dr. Andrews' hair was touched.[5]

According to Scott, hair touching and requests to touch are "very derogatory" within black culture. As Scott phrased it: "We're not pets." The point is well-taken. In the context of sexual harassment, "repeated . . . physical touching" often represents evidence of a hostile work environment. Okoli v. City Of Baltimore, 648 F.3d 216, 221 (4th Cir. 2011).

Based on this evidence and authority, the court concludes that unwanted physical touching of hair, if done so "because of" an individual's race, may constitute actionable race-based harassment under Title VII. Cf. Strothers, 895 F.3d at 332 (for purposes of retaliation claim, plaintiff could reasonably believe she was subjected to a hostile work environment, in part, based on evidence that employer touched her pants as part of alleged race harassment campaign). Yet White's attribution of hair touching to "fascination" does not indicate that it was "extremely serious" harassment of the same magnitude as hateful slurs with a clear history of animus attached to them. Boyer-Liberto, 786 F.3d at 281; Jennings v. Univ. of North Carolina, 482 F.3d 686, 695

---

[5]    The relevant testimony relayed hearsay from Dr. Andrews provided after meetings, recounting that "There were times that [Dr. Andrews] had an afro. And sometimes people made comments about that. 'Oh, your hair looks so nice,' or people would <u>try</u> to touch her hair . . . ." Puryear Dep. 32:10–13 (emphasis added). And in response to the question "Who were these individuals who were making these comments or touching her hair?" Puryear testified as to where those comments took place and about his lack of knowledge as to "who said what comment." Id. 33:1–10.; ECF No. 35-7, Deposition of Renee Akers ("Akers Dep.") 14:5–14 (Dr. Andrews "mentioned that someone had wanted to touch her hair."). This hearsay evidence, at most, addresses <u>attempts or requests</u> by others to touch Dr. Andrews' hair. The court declines to speculate that Dr. Andrews was unwillingly touched, particularly when her complaint made no such allegation.

(4th Cir. 2007) (en banc) (citing <u>Meritor</u>, 477 U.S. at 65) (noting that a hostile work environment claim arises from conduct "<u>aimed</u> to humiliate, ridicule, or intimidate") (emphasis added).

The court also examines hair-related comments. Dr. Andrews only recounted facially neutral statements about her hair. Andrews Dep. 140:22–141:17 (testimony regarding comments that Dr. Andrews should "wear [her] hair naturally and in a fro" and "Oh, my god. Look at your hair and your skirt"). While Scott and White also testified that fellow employees asked about touching their hair, courts have not found that requests alone constitute "severe" harassment. <u>Green v. Avis Budget Grp., Inc.</u>, No. 11-CV-00269, 2017 WL 35452, at *19 (W.D.N.Y. Jan. 4, 2017), <u>report and recommendation adopted,</u> 2017 WL 1435670 (W.D.N.Y. Apr. 24, 2017) (single request to touch black woman's hair could not create a hostile work environment); <u>Rivera v. Orange Cty.</u>, No. 10-CV-9134, 2013 WL 812016, at *3–8 (S.D.N.Y. Mar. 5, 2013) (comments about black hair and racial slurs over six-year period were insufficiently severe or pervasive); <u>Hudson v. Blue Cross Blue Shield of Alabama</u>, No. 09-CV-920, 2010 WL 11519253, at *14 (N.D. Ala. Dec. 14, 2010), <u>aff'd</u>, 431 F. App'x 868 (11th Cir. 2011) (requests to touch black woman's hair and allegedly disparate treatment did not constitute hostile work environment).

In conclusion, Dr. Andrews has not provided evidence that hair touching or requests to touch hair occurred more than "sometimes," or that it was so offensive as to automatically create a jury issue, or that it interfered with anyone's work performance. <u>Sunbelt Rentals, Inc.</u>, 521 F.3d at 315 (listing factors). Stated otherwise, Dr. Andrews', White's and Scott's testimony—along with a jury's common sense—permits the reasonable inference that a form of racial harassment "sometimes" occurred, but fails to show that this conduct itself was either severe or pervasive harassment. <u>Compare Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 75–76 (2d Cir. 2001) (reversing summary judgment, and holding that "ongoing" hair touching could constitute severe and

pervasive sex-based harassment) with Powell-Pickett v. A.K. Steel Corp., 549 F. App'x 347, 354 (6th Cir. 2013) (affirming summary judgment because an insult and a single instance of touching a black woman's hair "constitute[d] sporadic mean conduct but not the severe or pervasive harassment of a hostile work environment").

### c. Alleged Disparate Treatment

Finally, the court turns to Dr. Andrews' sundry allegations regarding disparate treatment. For example, Dr. Short did not take walking meetings with Dr. Andrews, but she did not with white employees either. Dr. Andrews wished to receive additional training, but fails to detail what training other white employees received, and she did not. Likewise, Dr. Andrews asked for a promotion to a position that did not exist in her unit, and did not receive it. To be sure, Dr. Andrews' office was a mess when she started work, but it was in the same state while her white predecessor worked there. Moreover, in time, Dr. Andrews was able to remodel and repair her space. Dr. Andrews wanted to use the Blumen software, but admits there were security concerns raised by Virginia Tech that she did not understand, and that Virginia Tech made use of Blumen only after the company fixed those issues. While Dr. Andrews believed the audit of her unit was targeted, undisputed testimony showed that it was part of a periodic program and applied to her division as a whole. Finally, Umbarger-Wells filed a sex harassment claim against Dr. Andrews—alleging sexually charged conduct—and Virginia Tech investigated that claim. Virginia Tech officials determined that the claim was without merit.

These events—which Dr. Andrews attributes to her race, based on her "belief," "suspicion, and "gut feeling"—fail to show actionable disparate treatment or racial animus. Gilliam v. S.C. Dep't Of Juvenile Justice, 474 F.3d 134, 142 & n.9 (4th Cir. 2007) (affirming grant of summary judgment where "[t]he few specific examples" of purportedly disparate treatment motivated by

22

race "were not supported by any evidence other than [plaintiff's] own general statements, which often lacked detail"); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280–81 (4th Cir. 2000) (affirming summary judgment on hostile work environment claim under 42 U.S.C. 1981 where plaintiff did "nothing more than speculate" that she was fired because of race, and declining to "impute a racial character to [the defendant's statement and conduct] based simply on the [plaintiff's] conjecture"); Evans, 80 F.3d at 959 (A plaintiff's "own naked opinion, without more, is not enough to establish a *prima facie* case of discrimination[.]") (internal quotation marks and alterations omitted); Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998) (holding that "conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment").

Although Virginia Tech did not conclude that Dr. Andrews had harassed Umbarger-Wells, the record presents conflicting evidence as to whether Dr. Andrews actually said what was alleged in Umbarger-Wells' complaint. The court concludes that this is not a material dispute of fact that would allow Dr. Andrews' claim to survive summary judgment. Even if Umbarger-Wells fabricated the allegations from whole-cloth, Dr. Andrews has not provided evidence that would allow a rational jury to find that Umbarger-Wells filed the complaint with racial animus. Irani v. Palmetto Health, 767 F. App'x 399, 417 (4th Cir. 2019); Hawkins, 203 F.3d at 281 (affirming summary judgment based on failure to provide evidence of racial animus "[e]ven if [the supervisor] harbored some personal dislike of [the plaintiff] that made [her] job more difficult or stressful"); Hemphill v. United Parcel Serv., Inc., 975 F. Supp. 2d 548, 566 (D.S.C. 2013) (granting summary judgment where evidence showed yelling and other harsh behavior, including "false allegations" about attendance issues, but no racial animus).

Stripped of Dr. Andrews' conclusory attributions of racial bias, the vast majority of these events are non-actionable under Title VII. "Workplaces are not always harmonious locales," and

23

thus, ordinary workplace issues such as "'a routine difference of opinion and personality conflict with [one's] supervisor,' are not actionable under Title VII." Sunbelt Rentals, Inc., 521 F.3d at 315–16 (citing Hawkins, 203 F.3d at 276). "It is not enough for a plaintiff to demonstrate that (1) there was racism in the workplace and (2) the workplace was also hostile. Instead, to present an actionable hostile work environment claim, the work environment must be *racially* hostile." Irani, 767 F. App'x at 417 (citing Pryor v. United Air Lines, Inc., 791 F.3d 488, 495 (4th Cir. 2015)) (affirming summary judgment on hostile work environment claim); Goldberg v. B. Green & Co., 836 F.2d 845, 849 (4th Cir. 1988) (holding evidence showing that treatment was "arbitrary" was insufficient where "it [did] not reflect any intent to discriminate on the basis of *age*").

The most serious of Dr. Andrews' allegations relate to Puryear and Weddle. Compl. ¶¶ 61–64 (alleging that the underlying events occurred around January 2016). According to Scott, Dr. Short paid Puryear—a racial minority with a higher rank than Weddle—a lower salary than Weddle. The record lacks evidence on how Virginia Tech determines employee pay, if there were pay bands for each position, and what Puryear's and Weddle's respective qualifications were. For purposes of deciding this motion, however, the court will assume that Dr. Andrews has demonstrated an instance of racially disparate pay. That alone, however, does not constitute a hostile work environment, and Dr. Andrews provides no evidence that this pay discrepancy affected her ability to perform her job. Perkins, 936 F.3d at 209.

### d.   The Totality of the Evidence

The question remaining for the court is whether the totality of the evidence supported by specific, admissible facts shows "that a reasonable jury could find that the . . . race-based harassment was so severe or pervasive as to alter the conditions of [Dr. Andrews'] employment and create an abusive or hostile atmosphere." Cent. Wholesalers, Inc., 573 F.3d at 175; Fed. R.

Civ. P. 56(c)(4). This inquiry "is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22. Severe instances of discrimination, even if isolated, may defeat summary judgment on a hostile work environment claim. See Boyer-Liberto, 786 F.3d at 280 (reversing summary judgment based on "two uses of the 'porch monkey' epithet"). Dr. Andrews has not shown that her case falls in this category. Indeed, her counsel agreed at oral argument that there is no "smoking gun." While plaintiffs may certainly prove a hostile work environment claim without such evidence, no rational jury could find that Dr. Andrews can meet this burden. ·

Two recent Fourth Circuit opinions guide this court's analysis. In Perkins v. International Paper Company, the Fourth Circuit affirmed a grant of summary judgment for defendants in the face of evidence that black employees were treated less favorably than white employees, that black employees were unfairly denied promotions, and that there were "two incidents" of racially offensive conduct that the plaintiff knew of over the plaintiff's thirty-year employment. Perkins, 936 F.3d at 204, 208–11 (affirming grant of summary judgment where the plaintiff was told that a co-worker wore a KKK hat in 2006, and the plaintiff "was told that an African American female employee overheard a white employee, when given a work assignment, complain that he was being asked to work like a n*****"). The Fourth Circuit further concluded that "experiences of third parties about which a plaintiff was unaware" during his employment "should not be considered in evaluating a hostile work environment's severe or pervasive requirement." Id. at 210.

In Irani v. Palmetto Health, the Fourth Circuit also affirmed a grant of summary judgment on a race-based hostile work environment claim. 767 F. App'x at 417. There, a supervisor referred to the plaintiff, of Indian descent, as "Achmed the terrorist" twice in an eighteen-month period. The plaintiff also raised a host of other complaints—such as receiving poor reviews, being placed in a remediation program, receiving an irreverent magazine article, and being on the receiving end

of a "personal vendetta" from his supervisor—all of which the plaintiff attributed to race. Id. at 401–13. The Fourth Circuit first ruled that the statements at issue, while "odious," were of a different character than those in Boyer-Liberto, and would not alone create a hostile work environment. On that evidence, the Fourth Circuit refused to make the "massive inferential leap" that because the supervisor had "used racially insensitive language a couple of times," every interaction between the supervisor and the plaintiff or the plaintiff and his coworkers "was infected by racial hostility." Id. at 417.

Given the evidence in Dr. Andrews' case, the court believes that the ruling in Perkins is especially instructive. Perkins has been applied by other District Courts in similar cases. In Jackson v. Maryland Department of Commerce, the plaintiff "describe[d] two denied promotions, the failure to receive a raise, and one lost training opportunity over the course of her employment . . . which span[ned] over a decade." No. 19-CV-1693, 2020 WL 551914, at *7 (D. Md. Feb. 4, 2020). She also described "repeated[]" questions from supervisors as to whether she was "up to the job." Id. The court granted a motion to dismiss her hostile work environment claim, noting that she "ha[d] not provided any details about how often she [was] asked these questions or how these questions ha[d] interfered with her job," or how they indicated racial animus. Id. (citing Perkins, 936 F.3d at 209 among other authority). Similarly, in Short v. Berryhill, the plaintiff based her hostile work environment claim on criticism from her supervisor, her supervisor's refusal to answer questions verbally, unfavorable work assignments, and a "series of aggressive emails." No. 18-CV-2714, 2019 WL 4643806, at *17 (D. Md. Sept. 24, 2019). The court granted summary judgment, concluding that these allegations could not constitute severe or pervasive harassment.

Considering the evidence in its totality, and in the light most favorable to Dr. Andrews, the court cannot agree with Dr. Andrews that she has provided evidence from which rational jury could find that "a reasonable person would perceive [her] environment to be abusive or hostile." Cent. Wholesalers, Inc., 573 F.3d at 175. In the court's view, the evidence simply fails to support a claim that Dr. Andrews was subjected to severe or pervasive harassment.

## II.    **Discrimination**

To establish a race discrimination claim, Dr. Andrews must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Goode v. Cent. Va. Legal Aid Soc'y, Inc., 807 F.3d 619, 626 (4th Cir. 2015). In this case, because she resigned from Virginia Tech, Dr. Andrews opposed summary judgment by arguing that the relevant adverse employment action was a constructive discharge. Opp. at 27–28.

The court assumes that Dr. Andrews can prove elements 1 and 2 of her discrimination claim, but concludes that she has not provided facts that would allow a reasonable jury to find that she was constructively discharged. To prove constructive discharge, "[f]irst, a plaintiff must show that [her] 'working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign.' Second, a plaintiff must actually resign because of those conditions." Perkins, 936 F.3d at 211–12 (quoting Green v. Brennan, 136 S.Ct. 1769, 1776–78 (2016) (internal citations and quotation marks omitted)). The only issue in this case is the intolerability requirement, which the court concludes Dr. Andrews cannot prove.

The court looks to Fourth Circuit comparators. In Williams v. Giant Food, Inc., the Fourth Circuit did not find intolerable working conditions where "supervisors yelled at [the employee], told her she was a poor manager, gave her poor performance evaluations, chastised her in front of

27

customers, and once required her to work with an injured back." 370 F.3d 423, 434 (4th Cir. 2004). Similarly, in Matvia v. Bald Head Island Management, Inc., the Court held that being ostracized, denied a promotion, and going through mandatory counseling for turning in an inaccurate time card did not make the workplace intolerable. 259 F.3d 261, 273 (4th Cir. 2001) ("These incidents might have made the workplace less enjoyable for a reasonable person, but not intolerable."). In Munday v. Waste Management of North America, the Court concluded that being ignored by co-workers and management was insufficient to establish constructive discharge. 126 F.3d 239, 244 (4th Cir. 1997) (employee was never reprimanded and resigned seventeen months after events at issue). And in Carter v. Ball, the Court ruled that being unfairly criticized, losing supervisory responsibilities, and having one's supervisor display a poster that may have been offensive to African Americans was insufficient to establish constructive discharge. 33 F.3d 450, 459–60 (4th Cir. 1994). Dr. Andrews has offered less evidence of "intolerable" conditions than existed in these cases.

Further, "[p]roof of constructive discharge requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Perkins, 936 F.3d at 212 (internal quotation marks omitted). Accordingly, because the court concludes that Dr. Andrews cannot succeed on her hostile work environment claim, her discrimination claim based on a constructive discharge theory must also be dismissed. The court will enter summary judgment as to Dr. Andrews' discrimination claim.

## III.   Retaliation

Title VII also prohibits an employer from taking an adverse employment action against any employee "because [s]he has opposed any practice made an unlawful employment practice under this subchapter." Title VII § 704(a), 42 U.S.C. § 2000e-3(a). To make a prima facie case of

28

retaliation, a plaintiff must show: (1) that she engaged in protected activity, (2) that the employer took a materially adverse action against her and (3) that there is a causal connection between the protected activity and the adverse action. See Burlington N. & S.F.R. Co. v. White, 548 U.S. 53, 61–68 (2006) (redefining the second element to be a "materially adverse action" instead of an "adverse employment action"). The Fourth Circuit has also recognized that Title VII's anti-retaliation provision protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful. Strothers, 895 F.3d at 327.

Protected activity includes "complaining to superiors about suspected violations of Title VII." Boyer-Liberto, 786 F.3d at 281. "To warrant protection, the employee's perception of a violation must be 'objectively reasonable' under the circumstances known to her . . . at the time of her complaint." Strothers, 895 F.3d at 328. To establish an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68 (internal quotation marks omitted).

Even assuming that Dr. Andrews engaged in protected activity—that it was objectively reasonable for Dr. Andrews to believe she was subject to a hostile work environment or other discrimination—her retaliation claim fails on the remaining two elements. Regarding the "materially adverse action" element, Dr. Andrews first points to Irvin's statement that she should take care in filing a discrimination complaint. Opp. at 35. Dr. Andrews, however, testified that she "didn't take it as a discouragement. No." Andrews Dep. 122:1–3. In addition, given that Irvin escorted her to where she could file a complaint, no reasonable jury could find that Irvin's

statement was a materially adverse action.

Next, Dr. Andrews maintains that the various actions she argues constituted a hostile work environment and a constructive discharge also support her retaliation claim. The court disagrees. See Evans v. Int'l Paper Co., 936 F.3d 183, 195 (4th Cir. 2019) ("Evans claims that, in response to her complaints, she generally was treated worse than white employees, by being ignored and left out of meetings. But these general complaints are also not enough to create a genuine issue of material fact. Evans must offer evidence of an actual retaliatory act that meets the 'materially adverse' standard. She has not done so."). There is, further, no specific, admissible evidence that there was a "causal connection" between these numerous events, over several years, and Dr. Andrews' informal complaints regarding perceived racial harassment. Burlington, 548 U.S. at 68; Perkins, 936 F.3d at 215 (no evidence of causation). In particular, regarding Umbarger-Wells' complaint, Dr. Andrews presented insufficient evidence upon which a reasonable jury could find that Umbarger-Wells was aware of Dr. Andrews' meetings and calls alleging a hostile work environment. In any event, Dr. Andrews was not punished as a result of the complaint. Accordingly, the court will enter summary judgment on the retaliation claim.

## IV. **Defenses**

In addition, Virginia Tech raised two defenses on summary judgment. Because the court grants Virginia Tech's motion on other grounds, it declines to consider those defenses.

## V. **Motions in Limine**

Dr. Andrews also submits two motions in limine. In her first motion, Dr. Andrews moves to preclude Virginia Tech from offering documents without Bates stamps at trial. ECF No. 42. In her second motion, Dr. Andrews argues that Virginia Tech missed the deadline to disclose witnesses and exhibits before trial, and thus should be precluded from offering any documents or

testimony at trial. ECF No. 43. These motions would not affect the court's decision on Virginia Tech's motion for summary judgment. Virginia Tech's motions seek to preclude testimony from Walker, Puryear, and Scott. ECF Nos. 38, 39, & 40. Except as noted in this opinion, the court considered these witnesses' testimony in granting Virginia Tech's motion for summary judgment. Accordingly, the court dismisses the pending motions in limine as moot.

## Conclusion

For the reasons stated, the court grants Virginia Tech's motion for summary judgment, and dismisses the pending motions in limine as moot.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This /2 day of February, 2020.

Senior United States District Judge